## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| The Mary L. Kieser Trust, by Mary L. Kieser and Ralph F. Kieser, Trustees, Derivatively and on Behalf of Nominal Defendant, Municipal Mortgage & Equity LLC, | ) ) ) ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| RICHARD O. BERNDT, MICHAEL L. FALCONE, ROBERT S. HILLMAN, BARBARA B. LUCAS, EDDIE C. BROWN, DOUGLAS A. MCGREGOR, FRED N. PRATT, JR., CHARLES C. BAUM, MARK K. JOSEPH AND ARTHUR S. MEHLMAN | ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| MUNICIPAL MORTGAGE & EQUITY LLC (Baltimore County), | ) ) ) |
| Nominal Defendant | ) |

Civil Case No. _____

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff The Mary L. Kieser Trust ("Plaintiff") brings this action through its Trustees, Mary L. Kieser and Ralph F. Kieser, derivatively and on behalf of Nominal Defendant Municipal Mortgage & Equity, LLC (hereafter "Municipal Mortgage," "MuniMae" or the "Company") against Individual Defendants herein, alleges the following based on information and belief based upon, *inter alia,* the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the

Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Municipal Mortgage and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff, through its trustees, and shareholders of Municipal Mortgage against certain current or former officers and directors of Municipal Mortgage seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from May 3, 2004 through the present, (the "Relevant Period") which has caused substantial losses to the Company.[1]

2.     Specifically, the Company's financial controls have been a mess and deficient for years. The Company's financial statements overstated the Company's earnings and understated its losses.  Indeed, the Company admitted as much in its January 28, 2008 Press Release where the Company announced that its previously-issued financial results and financial statements materially overstated the Company's financial performance and that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  Furthermore, the Company stated that it would likely be restating its financial statements for the years ended December 31, 2006, 2005 and 2004 and the Company would likely lose its eligibility of trading on the NYSE due to the fact that it would not be filing its Annual

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between May 3, 2004 and January 28, 2008, the Relevant Period continues through this day instead of ceasing on the day before the public became aware of the wrongdoings at the Company.

Report on Form 10-K for the year ended December 31, 2006 by the deadline imposed by the NYSE.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and 1391(b) because Nominal Defendant is headquartered in this District, substantially all of the Defendants either reside or conduct business in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District and the bulk of the evidence and civil witnesses relevant to this case are located in this District.

5.      This action is not a collusive one designed to confer jurisdiction on a court which it would not otherwise have.

## PARTIES

6.      Plaintiff, The Mary L. Kieser Trust, is and was during relevant times, a shareholder of Municipal Mortgage. The Mary L. Kieser Trust brings this action through Trustees, Mary L. Kieser and Ralph F. Kieser, citizens of the State of Missouri.

7.      Nominal Defendant Municipal Mortgage is a Delaware corporation which maintains its principal executive offices at 621 East Pratt Street, Suite 300 (Pier IV Building), Baltimore, Maryland 21202. Municipal Mortgage provides debt and equity financing to developers of multi-family housing and other types of commercial real estate. The Company invests in tax-exempt mortgage revenue bonds issued by state

and local authorities to finance multi-family housing developments. The Company operates in three business segments: debt segment, which invests in tax exempt bonds and bond securitizations, make taxable construction, supplemental and permanent loans, provide loan servicing, and originate loans that are ultimately sold to government sponsored enterprises (GSEs); tax credit equity segment that provides tax credit equity syndication and asset management services; and a structured finance segment that invests in other real estate-related securities, including equity investments in real estate operating partnerships, tax exempt and taxable bonds, bond securitizations and taxable loans, and fund management segment, which provides loan origination, loan servicing, investment advisory, asset management and other related services, and invests in real estate operating partnerships.

8.    Defendant Richard O. Berndt ("Berndt") is a citizen of the State of Maryland. He is, and was throughout the Relevant Period, a director of the Company.

9.    Defendant Michael L. Falcone ("Falcone") is a citizen of the State of Maryland. He is, and was throughout the Relevant Period, a director of the Company. Falcone has served as Chief Executive Officer ("CEO") and President of the Company since January 1, 2005. Prior to his appointment as the Company's Chief Executive Officer, Falcone served as the Company's Chief Operating Officer ("COO") since 1997.

10.    Defendant Robert S. Hillman ("Hillman") is a citizen of the State of Maryland. He is, and was throughout the Relevant Period, a director of the Company. Hillman also serves on the Company's Audit Committee and is Chairman of the Company's Compensation Committee.

11.     Defendant Barbara B. Lucas ("Lucas") is a citizen of the State of Maryland. She is, and was throughout the Relevant Period, a director of the Company. Lucas serves on the Company's Compensation Committee.

12.     Defendant Eddie C. Brown ("Brown") is a citizen of the State of Maryland. He is, and was throughout the Relevant Period, a director of the Company.  Brown also serves on the Company's Audit Committee.

13.     Defendant Douglas A. McGregor ("McGregor") is a citizen of the State of Maryland.  He is, and was during the Relevant Period, a director of the Company. McGregor serves on the Company's Compensation Committee.

14.     Defendant Fred N. Pratt, Jr. ("Pratt") is a citizen of the State of Maryland. He is, and was during the Relevant Period, a director of the Company.  Pratt is also Chairman of the Company's Audit Committee.

15.     Defendants Charles C. Baum ("Baum") is a citizen of the State of Maryland.  Baum is, and was during the Relevant Period, a director of the Company. Baum also serves on the Company's Audit and Compensation Committees.

16.     Defendant Mark K. Joseph ("Joseph") is a citizen of the State of Maryland. He is, and was during the Relevant Period, Chairman of the Board of the Company. From 1996 until January 2005, Joseph served as the Company's CEO.

17.     Defendant Arthur S. Mehlman ("Mehlman").  Mehlman is a citizen of the State of Maryland.  Mehlman is, and was during the Relevant Period, a director of the Company.  Mehlman also serves on the Company's Audit Committee and is considered an "audit committee financial expert."

18.    Defendants Berndt, Falcone, Hillman, Lucas, Brown, McGregor, Pratt, Baum, Joseph and Mehlman are hereinafter referred to collectively as the "Individual Defendants."

19.    The Individual Defendants, by reason of their positions as officers and/or directors of the Company are familiar with and have been privy to confidential and proprietary information concerning Municipal Mortgage and had access to material adverse non-public information concerning the Company. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the adverse material facts alleged herein concerning the Company's business and finances. The Individual Defendants controlled and/or possessed the authority to control the contents of the Company's press-releases and presentations to securities analysts and through them, to the investing public and had the opportunity to commit the fraudulent acts alleged herein.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.  exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.  exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.  exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

d.  when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

23.    Throughout the Relevant Period, Defendants engaged in a scheme and continuing course of conduct pursuant to which they issued a series of false and misleading statements to the market which misrepresented the operating and financial condition of the Company.

24.    On May 3, 2004, Municipal Mortgage issued a press release announcing its financial results for the first quarter of 2004, the period ending March 31, 2004. For the quarter, the Company reported net income allocated to common shares of $1.2 million, diluted earnings per share of $0.04 and cash available for distribution ("CAD") per common share of $0.37. Defendant Joseph, commenting on the results, stated, in relevant part:

> We are very pleased with the Company's results for the first quarter. As we had previously advised our investors, we expected first quarter results to come in below the prior-year figures due to seasonality in our tax credit equity syndication business, which we significantly expanded through a July 2003 acquisition. While our CAD per share for the first quarter of 2004 did come in below the prior-year results, it significantly exceeded our expectations. This was largely due to strong results in our tax credit equity unit during the quarter. Based in part on the Company's results and our outlook for the remainder of the year, our Board of Directors recently raised the quarterly distribution to holders of our common shares to $0.4575, an increase of 3% over the same period in 2003.

25.    On August 2, 2004, Municipal Mortgage issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004. For the quarter, the Company reported net income allocated to common shares of $11.2 million, diluted earnings per share of $0.32 and CAD per common share of $0.61. Defendant Joseph, commenting on the results, stated, in relevant part:

> We are extremely pleased to have been able to raise our distribution for thirty consecutive quarters. So far this year we are outperforming our own and analysts' expectations, particularly in our tax credit equity business, and we expect to finish the year somewhere between 2% and 4% above analyst current consensus expectations of $2.22.

26.    On September 2, 2004, the Company announced that MFH Financial Trust I, a subsidiary of Midland Financial Holdings, Inc. ("Midland"), completed the sale of $24,000,000 of its 9.5% trust preferred securities. Midland is an indirect wholly owned

subsidiary of Municipal Mortgage. The press release stated that "[Midland] will use the proceeds to repay a portion of an inter-company loan from Municipal Mortgage. Municipal Mortgage, in turn, intends to use its proceeds for general corporate purposes."

27.    On November 10, 2004, Municipal Mortgage issued a press release announcing its financial results for the third quarter of 2004, the period ending September 30, 2004. For the quarter, the Company reported net income of $11.6 million, diluted earnings per share of $0.33 and CAD per common share of $0.72. Defendant Joseph, commenting on the results, stated, in relevant part:

> MuniMae is pleased to continue its long history of steady growth in cash generated by our businesses. The Company has recently declared its 31 st consecutive increase in its distribution to common shareholders. Despite higher regulatory and compliance costs, particularly those related to the Sarbanes-Oxley Act of 2002 our management team continues to deliver strong results.

28.    On February 2, 2005, the Company issued a press release announcing that it "raised gross proceeds of $68.3 million through the public offering of 2,575,000 common shares at a price of $26.51 per share."

29.    On March 15, 2005, the Company announced that MFH Financial Trust II, a subsidiary of MMA Financial Holdings, Inc. ("MMA Financial"), completed the sale of $50,000,000 of its 8.05% trust preferred securities to TABERNA Preferred Funding I, Ltd. and Merrill Lynch International. MMA Financial is an indirect wholly owned subsidiary of Municipal Mortgage. The press release stated that "[MMA Financial] will use the proceeds to repay a portion of a loan from an affiliate and other indebtedness of [MMA Financial] and its affiliates, and for general corporate purposes."

30.     On March 16, 2005, Municipal Mortgage distributed an earnings and production press release announcing its financial results for the fourth quarter and year end of 2004, the period ending December 31, 2004. For the quarter, the Company reported net income of approximately $5.6 million, diluted earnings per share of $0.16 and CAD per share of $0.63. Defendant Falcone, commenting on the results, stated, in relevant part:

> By capitalizing on the synergies between our tax credit business and our tax-exempt and taxable lending businesses, we successfully structured over $2.5 billion in multifamily and other real estate investments, which is a 68% increase over 2003 production. As a result, our Cash Available for Distribution ("CAD") per common share grew 9% over 2003, representing our 8th consecutive year of CAD per share growth.

With regard to certain aspects of the Company, the press release stated:

**Investing Segment**

During the three months ended December 31, 2004, MuniMae acquired tax-exempt bonds and entered into forward funding commitments for financings totaling approximately $145.4 million in par value, which is a 5% increase as compared to $138.1 million for the three months ended December 31, 2003.

For the twelve months ended December 31, 2004, MuniMae acquired tax-exempt bonds and entered into forward funding commitments for financings totaling approximately $401.6 million, which represents a 60% increase as compared to $250.4 million for the twelve months ended December 31, 2003.

Of the 2004 total, $321.1 million of the financings were tax-exempt bonds secured by affordable multifamily housing properties. The remaining $80.5 million were investments in Community Development District Bonds ("CDD") secured by assessments pledged by local governments for community infrastructure projects.

**Tax Credit Equity Segment**

MuniMae's Tax Credit Equity segment ended 2004 on a very strong note. During the three months ended December 31, 2004, the Company raised tax credit equity of approximately $487.9 million bringing the Company's total tax credit equity raised during 2004 to approximately $1.1 billion. In

addition to representing an increase of 99% over 2003, this accomplishment distinguished MuniMae as one of only two companies to surpass the $1 billion mark in tax credit equity raised during a calendar year. MuniMae had approximately $6 billion in tax credit equity assets under management as of December 31, 2004.

In addition, during the fourth quarter, the Company made equity investments in tax credit properties totaling $303.2 million. These equity investments brought the Company's total twelve-month investment activity to $846.3 million, which is an increase of approximately 86% as compared to 2003 and, we believe, a record breaking amount for the industry for a single year.

Other accomplishments of the Tax Credit Equity segment in 2004 included the establishment of a guaranteed tax credit equity program with Merrill Lynch, through which the Company raised $165 million in investor equity, and the development and implementation of a joint program to improve our marketing of tax credit equity and bond financing to developers.

**Real Estate Finance Segment**

MuniMae's Real Estate Finance segment production was approximately $348.1 million during the three months ended December 31, 2004, bringing the segment's total production for the twelve months ended December 31, 2004, to approximately $1.0 billion. This represents a 45% increase over the 2003 production volume and brought the segment's total assets under management to approximately $2.1 billion as of December 31, 2004.

31.     Municipal Mortgage financial results for the fourth quarter and year end of 2004, the period ending December 31, 2004, were repeated in the Company's Report on Form 10-K filed with the SEC on March 16, 2005 and signed by Defendants Joseph, Falcone, Baum, Berndt, Brown, Hillman, McGregor, Mehlman and Pratt.  Defendant Falcone also certified the Form 10-K.

32.     On May 2, 2005, Municipal Mortgage distributed an earnings and production press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005. For the quarter, the Company reported net income of $2.2 million, diluted earnings per share of $0.06 and CAD per share of $0.42. Defendant Falcone, commenting on the results, stated, in relevant part:

11

We had a productive first quarter and remain on track to meet our overall earnings per share and CAD per share targets for fiscal year 2005. Our business volumes continue to grow in our major business segments. In addition, during the quarter we completed a successful public offering of common equity and a private placement of subsidiary trust preferred securities, which together raised $118 million of capital. Finally, we closed a small but strategically important acquisition of an established business, which we have re-branded MMA Realty Capital and which we expect to form the cornerstone of an expanded fund management business targeting pension funds, insurance companies and other institutional investors.

With respect to certain aspects of the Company's business, the press release stated:

### Production Summary

*Investing Segment*: During the three months ended March 31, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments for financings totaling approximately $55.3 million in par value, which is a 12% increase as compared to $49.3 million for the three months ended March 31, 2004. All of the first quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits.

*Tax Credit Equity Segment*: During the three months ended March 31, 2005, the Company raised $107.4 million in tax credit equity, representing an 18% increase over the three months ended March 31, 2004. In the first quarter of 2005, MuniMae also closed its largest tax credit equity fund to date, raising $319 million from sixteen corporate investors.

*Real Estate Finance Segment*: MuniMae's Real Estate Finance segment production was approximately $161.3 million during the three months ended March 31, 2005, which represents a 22% decrease as compared with the three months ended March 31, 2004. If not for a single $66.7 million construction loan transaction closed in the first quarter of 2004, we would have shown a year-over-year increase in first quarter production of 14% for this segment.

33.    On July 1, 2005, the Company issued a press release announcing that it closed on the acquisition of Glaser Financial Group, Inc. for a purchase price, payable in combination of cash and stock, of approximately $67.0 million.

34.    On July 28, 2005, Municipal Mortgage distributed an earnings and production press release announcing its financial results for the second quarter of 2005,

the period ending June 30, 2005. For the quarter, the Company reported GAAP diluted earnings per share of $0.58 and CAD of $0.55 per share. Defendant Falcone, commenting on the results, stated, in relevant part:

> MuniMae had a productive second quarter and, though our year-to-date CAD per share is essentially flat as compared with the first half of 2004, it was above our internal budget. Moreover, based on a review of our pipeline and business prospects for the remainder of the year, we are on track to meet or slightly exceed the current analysts' consensus CAD estimate of $2.41 for fiscal 2005.

> We are increasingly seeing the benefits of the diversification strategy we have pursued for the past six years. While the persistent low interest rate environment is causing pricing pressure in some of our business lines, particularly in our tax-exempt bond business, we are simultaneously benefiting from a strong seller's market for multifamily properties, and we are seeking to take advantage of this market to harvest significant gains on some of our equity investments and bonds. The regular realization of gains on sale has been part of our overall business plan for several years, and the pricing we have seen this year has generally met or exceeded our going-in return expectations for these investments. We remain committed to our strategy of diversifying our product offerings while building scale, both through acquisitions and through organic growth in our existing businesses. In this connection, we are very pleased to have closed the Glaser Financial acquisition, which gives us new product capabilities, additional scale in our DUS lending franchise, geographic diversification in our loan servicing portfolio and a strong management team.

With respect to certain aspects of the Company's business, the press release stated the following:

**Production Summary**

*Investing Segment*: For the three and six months ended June 30, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments totaling approximately $40.7 million and $96.0 million in par value, representing a decrease of 67% and 44% as compared to the three months and six months ended June 30, 2004, respectively. All of the second quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits syndicated by MuniMae and other third party syndicators.

*Tax Credit Equity Segment*: For the three and six months ended June 30, 2005, MuniMae raised $215.3 million and $322.7 million of tax credit equity, representing a decrease of 12% and 4% as compared to the three months

and six months ended June 30, 2004, respectively. For the three and six months ended June 30, 2005, MuniMae invested $220.2 million and $394.2 million in tax credit properties, representing an increase of 15% and 18% as compared to the three months and six months ended June 30, 2004, respectively.

*Real Estate Finance Segment*: For the three and six months ended June 30, 2005, MuniMae's Real Estate Finance segment production was $315.4 million and $476.8 million, representing an increase of 4% and a decrease of 7% as compared to the three months and six months ended June 30, 2004, respectively.

35.   On November 4, 2005, the Company issued a press release announcing that MuniMae TE Bond Subsidiary, LLC ("TEB"), an indirect wholly owned subsidiary of Municipal Mortgage, completed a $100 million private placement of rated tax-exempt perpetual preferred shares with a weighted average distribution rate of 5.43%. The press release stated that "TEB intends to use the net proceeds from this offering to acquire investments that produce tax-exempt interest income and for general corporate purposes, which may include the repayment of indebtedness of TEB to an affiliated entity."

36.   On November 7, 2005, Municipal Mortgage distributed an earnings and production press release announcing its financial results for the third quarter of 2005, the period ending September 30, 2005. For the quarter, the Company reported net income of $20.4 million, diluted earnings per share of $0.52 and CAD of $0.76 per share. Defendant Falcone, commenting on the results, stated, in relevant part:

Although our tax-exempt bond originations in 2005 have fallen significantly below 2004 levels, production volumes remain strong in our other lines of business, and the continued low interest rate environment has enabled us to sell selected investments at very attractive cap rates. We remain confident in our outlook for the rest of the year, and based on our current pipeline, we expect CAD per share for the fiscal year 2005 to be at least $2.43.

With respect to certain aspects of the Company's business, the press release stated:

**Production Summary**

*Investing Segment*: For the three and nine months ended September 30, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments totaling approximately $80.2 million and $176.2 million in par value, representing decreases of 6% and 31 % as compared to the three months and nine months ended September 30, 2004, respectively. All of the third quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits syndicated by MuniMae and other third party syndicators.

*Tax Credit Equity Segment*: For the three and nine months ended September 30, 2005, MuniMae raised $370.2 million and $692.9 million of tax credit equity, representing an increase of 32% and 12% as compared to the three months and nine months ended September 30, 2004, respectively. For the three and nine months ended September 30, 2005, MuniMae invested $254.5 million and $595.6 million in tax credit properties, representing increases of 22% and 10% as compared to the three months and nine months ended September 30, 2004, respectively.

*Real Estate Finance Segment*: For the three and nine months ended September 30, 2005, MuniMae's Real Estate Finance segment production was $726.8 million and $1,240.2 million, representing an increase of 293% and 78% as compared to the three months and nine months ended September 30, 2004, respectively. Increased production in this segment was driven largely by taxable debt production from the business formerly known as Glaser Financial, acquired on July 1, 2005, and production within the Company's fund management business, which grew significantly as a result of an acquisition that closed in February 2005.

37.     On March 10, 2006, the Company issued a press release announcing that it restated net earnings for the nine month period ended September 30, 2005, as well as fiscal years 2004, 2003 and 2002, resulting in higher aggregated net earnings over this period than previously reported.

38.     On April 11, 2006, Municipal Mortgage issued a press release announcing its financial results for the fourth quarter and year end of 2005, the period ending December 31, 2005. For the quarter, the Company reported net earnings of $16.1 million, diluted earnings per share of $0.42 and CAD per share of $0.78. Defendant Falcone, commenting on the results, stated, in relevant part:

We accomplished a great deal in 2005. We closed the acquisitions of MONY Realty Capital and Glaser Financial which significantly expanded the mortgage banking products we offer as well as the services we can provide to institutional investors. In addition, we reorganized our operations to improve profitability and client service for many years to come. With greater diversity of revenue sources, a more efficient operating platform and a distribution that represents a lower percentage of CAD, MuniMae is well positioned for continued growth over the long-term.

Municipal Mortgage's financial results for the fourth quarter and year end of 2005, the period ending December 31, 2005, were repeated in the Company's Report on Form 10-K, filed with the SEC on or about June 22, 2006 and signed by Defendants Falcone and Joseph.

## The Company Announces A Restatement of its Financials

39.     The Company's auditors disclosed the following as material weaknesses identified as of December 31, 2005 which resulted in the restatement of the Company's consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004:

>     1.   *Ineffective control environment* — The Company did not maintain an effective internal control environment as defined in the COSO framework. Specifically, they identified the following material weakness related to their control environment:

- The Company did not maintain a sufficient complement of personnel with a level of accounting knowledge and experience in the application of GAAP commensurate with their financial reporting requirements and business activities, particularly as their business grew in diversity and complexity.

- The Company did not maintain or disseminate accounting policy guidance with respect to certain areas with a sufficient level of precision to enable existing personnel to adequately analyze related transactions and apply accounting policies that were in conformity with GAAP.

- Their control environment did not emphasize the need to maintain effective controls to monitor results of operations determined in accordance with GAAP. Specifically, they did not budget net earnings and did not maintain a process to monitor net earnings results against expected results.

These material weaknesses contributed to the material weaknesses discussed below in paragraph 2 through 7, and resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all their financial statement accounts and disclosures that would cause a material misstatement of the Company's annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

**2. *Ineffective financial reporting process*** — The Company did not maintain effective controls, including monitoring, over their financial close and reporting process. Specifically, they identified the following material weaknesses related to the financial reporting process:

- Controls over journal entry review and account reconciliations failed to prevent or detect material financial statement errors. In addition, the Company failed to design and implement exception and monitoring reports to review transactions and detect errors and to integrate their subsidiary and feeder systems with their general ledger system. As a result, their financial reporting process is manually intensive and is based on the review and approval of individual transactions (and resulting journal entries) without adequate compensating controls to detect errors.

- The Company did not maintain effective controls over the identification and disclosure of their segments. Specifically, they did not identify their segments or report their performance in the same manner for external reporting purposes and for reporting to their chief operating decision maker. This control deficiency resulted in segment disclosures that did not conform to GAAP.

These material weaknesses in their financial reporting process contributed to the material weaknesses discussed below in paragraphs 3 through 7, and resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all their financial statement accounts and disclosures that would cause a material misstatement their annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

**3. Accounting for tax credit equity business** — The Company did not maintain effective controls over the accuracy of their accounting for the tax credit equity business. Specifically:

- *Accounting for real estate syndication fees* — The Company did not correctly recognize syndication fees ratably as syndication partnerships invested in low income housing properties as required by GAAP. Instead, they (1) eliminated certain syndication fees related to consolidated syndication partnerships and (2) recognized syndication fees as investors subscribed to their funds and when they selected or acquired interests in low income housing properties to be sold to syndication partnerships rather than when the syndication partnerships made investments.

- *Accounting for impairments of investments in real estate partnerships held by guaranteed tax credit equity funds* — The Company presented equity in the impairment losses of low income housing properties owned by guaranteed tax credit funds and related revenues earned by providing related tax losses net instead of reporting these amounts separately as required by GAAP.

- *Accounting for consolidated tax credit equity funds* — The Company did not correctly record or did not properly reverse certain adjustments to ensure consolidated amounts were in accordance with GAAP.

- *Accounting for capitalized interest costs associated with investments in real estate partnerships* — The Company did not correctly capitalize interest costs on investments in real estate partnerships developing low income housing properties in accordance with GAAP.

This control deficiency resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, this control deficiency could result in a misstatement of syndication fee income, equity in the earnings (losses) of partnerships, interest expense, and net earnings (losses) allocated to minority interest that would result in a material misstatement in their annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

**4. Accounting for deferral and recognition of bond and loan origination fees and direct costs** — The Company did not maintain effective controls over the accuracy of their accounting for the deferral and recognition of bond and loan origination fees and direct costs and the related amortization expense. Specifically, they failed to amortize their deferred bond and loan fees using the effective interest method over their

contractual terms as required by GAAP rather than the straight-line method over terms anticipating prepayments. In addition, they failed to defer direct costs of originating bonds in accordance with GAAP and effectively monitor their recorded yields on bonds against their expected effective yields. This control deficiency resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of deferred bond and loan origination fees and the related amortization expense that would result in a material misstatement of their annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

**5. Accounting for investments in partnerships using the equity method of accounting** — The Company did not maintain effective controls to ensure accurate application of the equity method of accounting for investments in certain partnerships. Specifically, they did not apply the equity method to an investment when their share of the investee's cumulative losses exceeded their original investment even though they had guaranteed certain obligations of the investee. In addition, they did not account for differences between their cost of an investment and the amount of underlying equity of the investee. They also did not correctly calculate their share of this investee's losses using their economic share of the entity. This control deficiency resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of equity method investments and equity in their earnings (losses) that would result in a material misstatement of their annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

**6. Identification and valuation of derivative financial instruments** — The Company did not maintain effective controls over the identification and valuation of certain derivative financial instruments. Specifically, they did not maintain effective controls to identify derivative financial instruments embedded within financial guarantees. In addition, they did not maintain effective controls over the accuracy of assumptions used to value derivatives embedded within commitments to lend. This control deficiency resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of derivative financial instruments and related gains (losses) that would result in a material misstatement of their annual or interim financial statements that

would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

**7. Accounting for income taxes** — The Company did not maintain effective controls over the accounting for income taxes. They did not maintain effective controls over the completeness and accuracy of their income tax provision. This control deficiency resulted in the restatement of their consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of income taxes that would result in a material misstatement of their annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

40.    On September 13, 2006, the Company issued a press release announcing that it would restate its previously-filed consolidated financial statements for the three month period ended March 31, 2006, as well as for the years ended December 31, 2005, 2004 and 2003. In that regard, the press release stated:

> The restatement will not impact cash available for distribution, a supplemental nonGAAP performance measure reported by the Company in addition to net earnings, in any period, or the Company's ability to pay future distributions to common shareholders.

> In connection with previously announced efforts to improve its financial reporting processes, the Company identified the need to record adjustments for errors related primarily to three main areas: accounting for syndication fees, accounting for equity commitments related to affordable housing projects and the classification of cash received from investors in guaranteed tax credit equity funds.

> MuniMae's financial results for the first quarter of 2006, the period ending March 31, 2006, were reported in the Company's Report on Form 10-Q, filed with the SEC on or about August 1, 2006 and signed by defendant Lundquist.

41.    On November 16, 2006, the Company issued a press release announcing that one of its subsidiaries, Municipal Mortgage TE Bond Subsidiary, LLC ("TEBS"), had completed a $192 million fixed rate bond securitization with a private placement of Class

A TEBS Tax-Exempt Multifamily Housing Certificates, Series 2006A. The press release stated that the "net proceeds will be used to refinance $177 million of floating rate TEBS senior obligations and originate investments in tax exempt revenue bonds."

42.    On February 2, 2007, shares of the Company's stock closed at $31.74 per share. By February 9, 2007, shares of the Company's stock closed at $26.61 per share – a more than 16% difference in the closing price on February 2, 2007.

43.    On February 9, 2007, the Company issued a press release announcing that it "…knows of no reason why the recent trading of the stock has resulted in a decrease in price." In that regard, the press release continued as follows:

> Management of the Company is aware of recent developments in the sub-prime mortgage lending markets; however, to clarify, the Company is not engaged in sub-prime or any other single family mortgage lending activities. In fact, the debt and equity financings arranged by the Company in the housing sector are for multi-family rental properties. The Company's outlook for the multi-family rental sector is positive."

44.    On November 30, 2007, shares of the Company's stock closed at $17.22 per share. By December 12, 2007, shares of the Company's stock closed at $13.25 per share –more than a 23% difference in the closing price on November 30, 2007.

45.    On December 13, 2007, the Company issued a press release announcing that: "Management of the Company stated it is not aware of any pending transaction or event that might give rise to the recent volatility in the Company's stock price. In addition, management wants to reiterate that the Company is not engaged in sub-prime or any other single family mortgage lending activities."

46.    Then, on January 28, 2008, the Company issued a press release announcing its quarterly dividend.  The Company also disclosed that it would be extending the time in which it believed it would file its restated financial. However, as a

result of missing the previously announced March 3, 2008 deadline, the Company would not meet the necessary deadlines to file current financial reports necessary to maintain its listing status on the NYSE.  As a result, it would be delisted and trade on the over-the-counter market, "pink sheets".  Furthermore, the Company announced that it was slashing its dividend distribution from $0.5250 to $0.33 per share due to the cost of the Company's ongoing restatement of its financial statements.  The press release stated in relevant part:

> The reduction in the dividend distribution from $0.5250 to $0.33 per share is due to the cost of the Company's ongoing restatement of its financial statements, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business, an increasingly important part of the Company's business.

The Company also announced an update on its restatement:

> The overall impact of the restatement and the changes in the Company's accounting policies are still being quantified; however, the Company believes that the final result of the restatement will not materially change the previously recorded corporate cash balances of the Company and its subsidiaries. However, work on the restatement and the 2006 financial statements has not been completed and further work on the restatement or the audit of the 2006 financial statements could change these results.

> The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and commence delisting procedures. Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting. If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

47.     In response to the announcement of the restatement, the price of Municipal Mortgage stock dropped from $17.20 per share to $9.19 per share, on extremely heavy trading volume.

48.     On January 29, 2008, the Company filed its Form 8-K with the SEC. The Form 8-K provided additional information on the Company's announcement regarding the restatement of its financial results. In that regard, the Form 8-K stated in relevant part:

> The press release discusses the pending restatement of our audited financial statements for the year ended December 31, 2005 and 2004. That restatement has not been completed; however, we expect that the restatement will reflect the following changes to our accounting policies:
>
> • Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests. The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest. The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.
>
> • Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds. In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds. Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.
>
> • Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.

• Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.

• Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations, including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

• Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

Because neither the restatement nor the audit of our restated financial statements has been completed, it is possible that there will be additional changes as a result of the restatement. The changes as a result of the restatement will affect our financial statements for the year ended December 31, 2006 and subsequent years, as well as the financial statements that are being restated.

49.   Upon this news, the price of Municipal Mortgage's stock continued to fall to $7.13 per share.

50.   The statements referenced herein were each materially false and misleading when made because they failed to disclose and misrepresented that Municipal Mortgage: was materially overstating its financial performance by failing to properly account for its interests in certain entities; failing to timely write-down the fair value of its "held for-sale" loans, bonds, derivatives, mortgage servicing rights and guarantee obligations; materially overstating the fair value of these assets; lacked adequate internal controls and was therefore unable to ascertain its true financial condition.

51.    Based on the foregoing, Municipal Mortgage failed to disclose that its financial statements issued during the Relevant Period were materially false and misleading when issued and not prepared in accordance with GAAP and that the Company was performing poorly and would soon be forced to cut its dividend.

52.    The market for Municipal Mortgage's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Municipal Mortgage's common stock traded at artificially inflated prices during the Relevant Period.

## DEMAND WOULD BE FUTILE

53.    Plaintiff brings this action derivatively in the right and for the benefit of Municipal Mortgage to redress injuries suffered and to be suffered by Municipal Mortgage as a result of the breaches of fiduciary duty by the Individual Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

54.    Plaintiff will adequately and fairly represent the interests of Municipal Mortgage and its shareholders in enforcing and prosecuting its rights.

55.    Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile. At the time these derivative actions were commenced, the Board of Directors consisted of ten members: Richard O. Berndt, Michael L. Falcone, Robert S. Hillman, Barbara B. Lucas, Eddie C. Brown, Douglas A. McGregor, Fred N. Pratt, Jr., Charles C. Baum, Mark K. Joseph and Arthur S. Mehlman  (collectively, the "Directors").  All of these individuals have been named as Defendants.  As detailed below, each of the Directors are subject to

substantial personal liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

56.   All of these Directors face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability for their total abrogation of their duty of oversight. These Directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company.

57.   The Audit Committee is responsible, by its Charter, for overseeing the accounting and financial reporting process of the Company and the audit of the financial statements of the Company.  The Committee is also responsible for reviewing the financial information to be provided to the stockholders, reviewing the systems of internal controls and overseeing the Company's accounting and financial reporting process.  The Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.  Thus, the Audit Committee was responsible for overseeing and directly participating in the Company's financial reporting process.  Director Defendants Hillman, Brown, Pratt, Baum and Mehlman were members of the Audit Committee during the Relevant Period.  As a

result, these Defendants face a sufficiently substantial likelihood of liability for their breach of fiduciary duties.  Therefore, demand is futile as to these Defendants is futile.

**The Directors Lack Independence**

58.   Defendant Joseph has served as Chairman of the Board of Directors since 1996.  Prior to January 1, 2005, Defendant Joseph served as CEO.  Because of his former employment as an officer of Municipal Mortgage, Joseph lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

59.   Defendant Falcone has served as a member of the Board of Directors since 1999, and CEO and President of the Company since January 1, 2005.  As the Company's current CEO and President, Falcone lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

60.   Defendant Brown and Joseph serve on the Board of Greater Baltimore together.  Due to Brown's and Joseph's personal relationship, they lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

61.   Defendant Berndt and Brown have served on the Board of Mercantile together since 2003.  Due to Berndt's and Brown's personal relationship, they lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

62.   Defendant Joseph and Lucas serve on the Board of Provident together. Due to Joseph's and Lucas' personal relationship, they lack the sufficient independence

with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

63.   Defendant Falcone and Joseph have times with the Shelter Group. Defendant Faclone has served as the senior vice president and partner of the Shelter Group from 1983-1997.   Defendant Joseph is the founder of the Shelter Group and chairman of the board of Shelter and has a controlling 35% interest in the Shelter Group since 1977.   Due to Joseph's and Falcone's personal relationship, they lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

**Financial Relationships Between the Company and Defendant Falcone**

64.   *Midland Multifamily Equity REIT.* Defendant Falcone is a trustee for Midland Multifamily Equity REIT ("MMER"), an affiliate of the Company's that is a pooled investment vehicle owned by and comprised exclusively of a select group of institutional investors. MMER invests in income-producing real estate through limited partnership interests originated by us. To date, MMER has engaged in business transactions only with the Company.   The Company earns fee income for investment management services provided to MMER. In addition, the Company receives origination fees for investments placed with MMER. The Company earned fees totaling $0.7 million from MMER for the year ended December 31, 2005.   Due to Defendant Falcone's interrelated financial and business transactions with the Company, demand as to Defendant Falcone is futile.

65.   *Midland Affordable Housing Group Trust.* Defendant Falcone is also a trustee of Midland Affordable Housing Group Trust ("MAHGT"), an affiliate of the

Company's that is a pooled investment vehicle also owned by and comprised exclusively of a select group of institutional investors. MAHGT invests primarily in real estate backed debt investments originated by the Company. To date, MAHGT has engaged in business transactions only with the Company. The Company earns fee income from MAHGT for providing investment management services, originating MAHGT loans, and servicing individual MAHGT investments. The Company earns these fees on both MAHGT direct investments and investments funded through lines of credit backed by MAHGT assets. The Company earned fees totaling $0.9 million from MAHGT for the year ended December 31, 2005. The Company structures MAHGT's debt investments in real estate projects as back-to-back borrowings in which the Company borrows from MAHGT and lends the proceeds to developers. Although the Company presents these amounts as debt for financial reporting purposes, MAHGT bears the risk of loss on the underlying investments. These borrowings are non-recourse to the Company and are secured by a pledge to MAHGT of the debt investment made with MAHGT's funds. For the year ended December 31, 2005, the Company was party to documents representing indebtedness to MAHGT in an aggregate amount of $140.2 million which represents 3.6% of our consolidated total assets as of that date. Due to Defendant Falcone's interrelated business and financial transactions with the Company, demand as to Defendant Falcone is futile.

**Relationships Between the Company and Defendant Berndt**

66.   Defendant Berndt is the managing partner of the law firm Gallagher, Evelius & Jones LLP ("GEJ"). As of December 31, 2005, Defendant Berndt owned 5.7% of the equity of GEJ. GEJ provides legal services to the Company, some of which are provided as part of real estate transactions and are paid for by the borrowers and some of which are paid directly by the Company. Stephen A. Goldberg, a partner at GEJ, serves as the Company's General Counsel. The Company pays GEJ directly for Mr. Goldberg's legal services at his standard hourly rates, and Mr. Goldberg is eligible for an annual stock award but otherwise receives no compensation directly from us. For the year ended December 31, 2005, GEJ received $1.2 million in legal fees for borrower paid legal fees involving the Company and $3.7 million in legal fees paid directly by the Company. The fees paid directly by the Company represented 19.5% of GEJ's total revenues for 2005.  Due to Defendant Berndt's interrelated business transactions with the Company, demand as to Defendant Berndt is futile.

**Relationships Between the Company and Defendant Joseph**

67.   Defendant Joseph, through certain family holding companies, controls a 34.7% interest in The Shelter Group, LLC (the "Shelter Group"). The Shelter Group's operations include acting as a developer of, and providing property management services primarily to, multifamily residential real estate projects. The Shelter Group provides management services for certain properties that serve as collateral for some of the Company's tax-exempt bond investments, which included six properties during 2005. The Company paid the Shelter Group fees totaling approximately $0.7 million for property management services with respect to these properties during the year ended December 31, 2005, and the Company anticipates that it will transact an equal or

greater amount of business with the Shelter Group during 2006.   Due to Defendant Joseph's interrelated business transactions, demand as to Defendant Joseph is futile.

**The Company's Transactions with the Shelter Group**

68.   *Tax Credit Equity Syndication Transactions.* The Company acts as a tax credit equity syndicator for investments in affordable housing projects sponsored by the Shelter Group. During 2005, the Company's Tax Credit Equity segment closed two transactions with the Shelter Group. Total unfunded equity commitments for all projects sponsored by the Shelter Group were $7.8 million as of December 31, 2005. The Shelter Group receives development fees in connection with these transactions. We may engage in similar transactions during 2006.  The Board of Directors authorized the continued investment in and syndication of tax credit equity investments in affordable housing projects sponsored by the Shelter Group and approved and ratified all prior tax credit transactions with the Shelter Group.  Due to the Company's financial transactions with the Shelter Group, which Defendant Joseph controls a 34.7% interest in and thus benefits financially, demand is futile as to Defendant Joseph.

69.   *Shelter Group Revolving Loan Agreement.* On February 28, 2005, the Company entered into a revolving loan agreement with a Shelter Group affiliate for loans to Shelter Group entities in an amount not to exceed $1.5 million (the "Shelter Loan Agreement"). The facility is evidenced by a loan agreement and note with the Shelter Group, together with separate notes for each property on which a loan is made signed by the relevant property partnership. During 2005, the maximum amount of indebtedness outstanding under the Shelter Loan Agreement was $0.9 million and as of December 31, 2005 there was no outstanding balance under the Shelter Loan

Agreement. Due to the Company's financial transactions with affiliates of the Shelter Group, which Defendant Joseph controls a 34.7% interest in and thus benefits financially, demand is futile as to Defendant Joseph.

**Transactions Between the Company and Other Affiliates of Defendant Joseph**

70. *Park View at Dundalk Apartments Project.* One of the Company's affiliated public tax credit equity funds holds a limited partner interest in Heritage Court Limited Partnership (the "Heritage Court Partnership"), and an affiliate of the Shelter Group serves as the general partner for the Heritage Court Partnership. The Heritage Court Partnership owns a property known as Park View at Dundalk Apartments (the "Park View Property"). Due to property specific issues, the Park View Property has no value to the Company. In December 2005, the Board of Directors approved the sale of the Park View Property to a special purpose limited liability company, PV Dundalk Holdings LLC (the "Park View Buyer"), formed by Defendant Joseph to acquire the Company's interest in the Heritage Court Partnership. Due to Defendant Joseph's interrelated financial transactions, which were approved and ratified by the Board, demand is futile as to Defendant Joseph and the entire Board of Directors.

71. *Creekside Village Apartments Project.* Defendant Joseph held an indirect interest in the limited partnership (the "Creekside Borrower") that owned the Creekside Village Apartments project, located in Sacramento, CA (the "Creekside Property"). Prior to August 2005, the Company held approximately $11.8 million aggregate principal amount in bonds (the "Creekside Bonds") related to the Creekside Property and were owed $225,000 on a related working capital loan to the Creekside Borrower (the "Creekside WC Loan"). In the early 1990s, the Creekside Borrower defaulted on its

payment obligations under the Creekside Bonds and the Creekside WC Loan. In the third quarter of 2005, the Company took control of the Creekside Borrower, sold the Creekside Property and redeemed the Creekside Bonds and repaid the Creekside WC Loan with the sale proceeds. As part of this transaction, a 501(c)(3) organization affiliated with Defendant Joseph received $26,346 for its interest in the Creekside Borrower.   Due to Defendant Joseph's interrelated financial transactions with the Company, demand is futile as to Defendant Joseph.

72.   *FSA Bond Portfolio.* In February 1995, the Company, acting as bondholder, and various property partnerships indirectly controlled by Defendant Joseph, as borrowers (the "FSA Borrowing Partnerships"), participated in the refunding of eleven tax-exempt bonds with an aggregate principal balance of $126.6 million. The general partners of the FSA Borrowing Partnerships are controlled by Defendant Joseph and the limited partner of the FSA Borrowing Partnerships is a limited liability company controlled by Defendant Joseph.  Due to Defendant Joseph's interrelated business and financial relationships with the Company, demand as to Defendant Joseph is futile.

73.   Defendant Joseph has ongoing business relationship regarding certain defaulted tax-exempt assets where the Company and entities Defendant Joseph either directly or indirectly owned, or currently owns, have a financial interest.  The table below disclosed the information regarding certain such Defaulted Tax-Exempt Assets where the Company and entities owned by Defendant Joseph have an interest:

*(dollars in thousands)*

| | As of December 31, 2005 | |
|---|---|---|
| **Entity** | **No. of Properties** | **Investment Carrying Value** (1) |

| | | |
|---|---|---|
| SCA Successor, Inc (2) | 2 | $  37,552 |
| SCA Successor II, Inc. (3) | 11 | 128,628 |
| MMA Successor I, Inc. (4) | 1 | 8,909 |
| Total | 14 | $ 175,089 |

(1)   Carrying value amounts do not reflect the fact that many of the bonds related to such properties have been securitized.

(2)   SCA Successor, Inc. is the general partner of certain Borrowing Partnerships (including certain of the FSA Borrowing Partnerships) and is controlled by Defendant Joseph.

(3)   SCA Successor II, Inc. is the general partner of certain Borrowing Partnerships (including certain of the FSA Borrowing Partnerships and is controlled by Defendant Joseph.

(4)   MMA Successor I, Inc., an entity owned and controlled by Defendant Joseph, is the general partner in one Borrowing Partnership.

74.   In addition to the above interrelated financial transactions, demand would be futile and useless for the additional following reasons:

a.   The Directors, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b.   The Directors of Municipal Mortgage, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Municipal Mortgage's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.   Each of the Directors exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.   In order to bring this suit, a majority of the Directors of Municipal Mortgage would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

    d.  The acts complained of constitute violations of the fiduciary duties owed by Municipal Mortgage's officers and directors and these acts are incapable of ratification; and

    e.  Municipal Mortgage has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Municipal Mortgage any part of the damages Municipal Mortgage suffered and will suffer thereby.

75. Plaintiff has not made any demand on the shareholders of Municipal Mortgage to institute this action since demand would be a futile and useless act for the following reasons:

    a.  Municipal Mortgage is a publicly held company with approximately thousands of shares outstanding, and thousands of shareholders;

    b.  Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

76. Municipal Mortgage has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### For Breach of Fiduciary Duty

77. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

78. The Individual Defendants owed and owe Municipal Mortgage fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed

and owe Municipal Mortgage the highest obligation of good faith, fair dealing, loyalty and due care.

79.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

80.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

81.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Municipal Mortgage has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

82.   Plaintiff, on behalf of Municipal Mortgage, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### For Abuse of Control

83.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

84.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Municipal Mortgage, for which they are legally responsible.

85.   As a direct and proximate result of the Individual Defendants' abuse of control, Municipal Mortgage has sustained significant damages.

86.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.   Plaintiff, on behalf of Municipal Mortgage, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### For Gross Mismanagement

88.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

89.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Municipal Mortgage in a manner consistent with the operations of a publicly held corporation.

90.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Municipal Mortgage has sustained significant damages in excess of millions of dollars.

91.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

92.   Plaintiff, on behalf of Municipal Mortgage, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### For Waste of Corporate Assets

93.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

94.    As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Municipal Mortgage to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

95.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

96.    Plaintiff, on behalf of Municipal Mortgage, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Individual Defendants
### For Unjust Enrichment

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

98.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Municipal Mortgage.

99.    Plaintiff, as a shareholder and representatives of Municipal Mortgage, seek restitution from the Individual Defendants, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against The Individual Defendants

### For Contribution And Indemnification

100.  Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

101.  Municipal Mortgage is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to Municipal Mortgage.

102.  Municipal Mortgage's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Municipal Mortgage is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are or may in the future be asserted against Municipal Mortgage by virtue of the Defendants' misconduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.     Awarding to Municipal Mortgage restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2008                    Respectfully submitted,

Donald Enright (MD013551)
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Fax: (202) 337-8090
*Local Counsel for Plaintiff*

-and-

William B. Federman, Esq.
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Fax:  (405) 239-2112

Marc S. Henzel
**THE LAW OFFICES OF MARC HENZEL**
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Fax: (610) 660-8080

*Attorneys for Plaintiff*

## VERIFICATION

I, _Mary Kieser / Ralph Kieser (Trust)_, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of **Municipal Mortgage & Equity, LLC (OTC: MMAB.PK)** and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_2-06-08_
Date

Signature _Mary Kieser_
_Ralph Kieser_